UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| SAMUEL G. CYR, | ) |  |
|---|---|---|
| Plaintiff | ) |  |
| v. | ) | 1:13-cv-00091-JCN |
| CITY OF BANGOR, et als., | ) |  |
| Defendant. | ) |  |

**DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**[1]

In this action, Plaintiff Samuel Cyr initially joined the City of Bangor, its Chief of Police, and police officers Joseph Baillargeon and Brad Johnston, alleging violations of his federal and state constitutional rights in connection with an arrest and prosecution. At the close of discovery, Plaintiff voluntarily dismissed his claims against the City and the Chief of Police. The two individual officer defendants have filed a motion for summary judgment on all claims: false arrest (Count I), excessive force (Count II), and malicious prosecution (Count III). As explained below, the Court grants Defendants' Motion as to Counts I and III, and denies the Motion as to Count II.

FACTUAL BACKGROUND

The facts as set forth herein are derived from the parties' Local Rule 56 statements, and present the evidence in the light most favorable to the non-movant, Plaintiff Samuel Cyr.

On December 2, 2011, Plaintiff visited Barnaby's night club in Bangor, Maine, in the company of his then girlfriend, Alexa Washburn, his cousin, Tyler Cyr, friends Tyler McNally and Chris Irish, and Alexa's friend, Jenna Duran. During the evening, Plaintiff encountered a former

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge John C. Nivison conduct all proceedings in this case, including trial, and to order entry of judgment. (ECF No. 36.)

1

colleague, Lisa Sirignano, and talked with her for a time, which encounter upset Alexa. According to Plaintiff's deposition testimony, Alexa was intoxicated, became jealous, and was rude and disrespectful toward Plaintiff for the remainder of the night. Plaintiff also consumed alcohol that evening, but denies being intoxicated.

When Barnaby's closed for the night, patrons exited the club *en masse* and congregated in the parking lot. The parking lot of Barnaby's at closing time was known for physical altercations and general unruliness, and it was common for police to be present. Plaintiff had been present at Barnaby's parking lot at closing time on prior occasions, and was aware that Bangor police officers were regularly present for crowd control and to intervene in the event of any altercations. Plaintiff concedes that there was nothing to suggest that the parking lot at Barnaby's in the early morning hours of December 3, 2011, would be any less raucous than usual. At the time, approximately two hundred patrons were circulating about the area. Plaintiff was aware that police officers were present, and were observing the crowd.

While Plaintiff and the rest of the crowd were milling about the parking lot, Plaintiff saw Alexa standing by the entrance talking to and exchanging phone numbers with two men whom Plaintiff did not know. Expecting that he would be leaving with her, Plaintiff called Alexa's name several times, but Alexa did not respond. Plaintiff believed that Alexa was ignoring him because she was jealous due to the attention that he had shown to Lisa. He became frustrated with Alexa, put his hands on her shoulders and yelled into her ear that he was "[expletive] done." A police officer was nearby at the time, heard the heated words, and observed that Alexa had a cut on her nose and that she was upset.

Two male witnesses to the exchange between Plaintiff and Alexa reported the same to Defendant Bangor Police Officer Joe Baillargeon, and described Plaintiff by the teal color of his shirt. According to Baillargeon, the men told him that they saw a man choke a woman and they

2

pointed to Plaintiff as the man in question. Baillargeon did not know either of the witnesses and, therefore, he had no prior information relating to their reliability. Baillargeon did not witness Plaintiff laying hands on Alexa (what Baillargeon described as the "choking incident" in his criminal trial testimony[2]). Defendants admit that Plaintiff had moved some distance away from Alexa by the time Baillargeon's attention was directed to Plaintiff. However, Baillargeon subsequently observed Plaintiff move through the crowd, and saw a woman "turned around quite quickly" as Plaintiff walked past her. Baillargeon testified that it appeared to him that Plaintiff had grabbed the woman and that her facial expression reflected that it was unwanted contact. Baillargeon could not hear any words exchanged between Plaintiff and the woman.

Plaintiff maintains that after confronting Alexa, he turned and walked away. Baillargeon approached Plaintiff about a minute after Plaintiff's initial exchange with Alexa, which exchange caused some witnesses to speak with Baillargeon. Baillargeon approached Plaintiff from behind, took hold of Plaintiff's wrist, and pushed Plaintiff into a van. Plaintiff's initial response was to pull back on his arm, but when he did he was not aware that the person laying hands on him was a uniformed police officer. Because Baillargeon had come from behind, Plaintiff could not see who had taken hold of him. Plaintiff did not hear anyone identify himself as a police officer and Baillargeon did not speak to Plaintiff before taking hold of him in the parking lot. Baillargeon pushed Plaintiff with enough force for Plaintiff's head to strike against the van.

Defendants state somewhat ambiguously that Defendant Officer Brad Johnston, also in uniform, went to Baillargeon's aid and that the three men "ended up on the ground" with Plaintiff "develop[ing]" a cut on his forehead and some superficial scrapes and bruises. By Baillargeon's account at the criminal trial, Plaintiff was "taken down to the ground." According to Plaintiff, his

---

[2] It is established for purposes of summary judgment that Plaintiff did not actually put his hands on Alexa's neck.

legs were swept out from under him and he was taken to the ground face first. While he was on the ground, his head was twice "smashed" into the pavement. Plaintiff reports that he was then handcuffed and forcibly bent into an extremely painful "C" position with the back of his head almost touching his heels. One witness described this hold as a "tower choke." Other than initially pulling back when Baillargeon took hold of his wrist, Plaintiff denies making any attempt to resist. When Baillargeon was returned to his feet, he could not see out of his left eye because of the blood running down his face. Photographs taken at 7:00 p.m. on December 3, 2011, depict some of Plaintiff's injuries.

After the incident, other officers took Plaintiff to the Penobscot County Jail for booking. Jail staff attended to the cut on Plaintiff's head and determined that he did not need medical treatment. The jail held Plaintiff for the remainder of the night. The Defendant officers were not present at the jail and there is no evidence concerning any communication between jail staff and either Defendant Johnston or Defendant Baillargeon that night.

Plaintiff first sought medical care on December 6, 2011, three days after the incident. His primary complaint at that time was that he suffered from anxiety-like symptoms and was having trouble sleeping. None of the physical injuries caused during the incident required any follow up medical treatment. Plaintiff's complaints of anxiety and insomnia have persisted, but he has not sought treatment from a mental health provider and has not been diagnosed with a psychological disorder. At the time of the incident, Plaintiff was enrolled in an education program pursuing a certificate or degree in respiratory therapy. He continued his education despite the December 3 incident. Plaintiff graduated as planned, and passed his licensing exam on his first attempt. Plaintiff has been gainfully employed since acquiring his license and has not missed work because of the incident. He does not suffer from any condition that impacts his ability to do his job as a respiratory therapist.

The State of Maine, through the Penobscot County Attorney's Office, prosecuted Plaintiff for domestic violence assault, assault, and failure to submit to arrest. A jury found Plaintiff not guilty on all charges.

## DISCUSSION

**A.     Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, there exists a trial-worthy controversy and summary judgment must be denied as to the supported claims. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**B.     Discussion**

Plaintiff has alleged three theories of recovery: false arrest, excessive force, and malicious prosecution. Plaintiff asserts his constitutional claims (i.e., false arrest, excessive force) under both federal law, 42 U.S.C. § 1983, and state law, 5 M.R.S. § 4682. Defendants contend that

Plaintiff cannot carry his burden on any of his substantive constitutional claims. Defendants alternatively argue that if Plaintiff can sustain a cause of action, Plaintiff's claims are barred by the doctrine of qualified immunity.

To determine whether Defendants are entitled to summary judgment on the constitutional claims, the Court "must determine (i) whether the plaintiff has asserted a cognizable violation of a constitutional right; (ii) whether that right was clearly established at the relevant time; and (iii) whether a reasonable public official in the defendant's position should have understood that his actions infringed that right." *Morelli v. Webster*, 552 F.3d 12, 22-23 (1st Cir. 2009).

In Plaintiff's third count, Plaintiff alleges a common law tort claim. Defendants maintain that Plaintiff cannot prevail on his malicious prosecution tort claim because Defendants have discretionary function immunity under the Maine Tort Claims Act.

### 1. False Arrest (Count I)

In Count I, Plaintiff asserts that the information available to Defendants Baillargeon and Johnston was insufficient to establish probable cause to arrest and, therefore, his arrest violated the Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Maine Constitution. The Fourth Amendment and Article 1, Section 5 of the Maine Constitution proscribe unreasonable seizures.

A warrantless arrest is reasonable "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Vongkaysone,* 434 F.3d 68, 73 (1st Cir. 2006). *See also State v. Enggass*, 571 A.2d 823, 825 (Me. 1990) (expressing the same standard). The existence of probable cause is determined by the totality of the circumstances and

focuses on what the officer knew at the time of arrest. *Vongkayson*, 434 F.3d at 73. The evaluation of what an officer might reasonably have understood turns on "common sense" and "practical considerations," not overly technical analyses. *Id.* (quoting *United States v. Meade*, 110 F.3d 190, 198 n.11 (1st Cir. 1997)). The inquiry is objective, and focuses on whether a reasonable officer with the same information known to the defendant officer(s) would have understood that probable cause existed to make an arrest. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Enggass*, 571 A.2d at 825.

Under Maine law, the crime of assault, for which crime Defendants maintain they had probable cause, is a Class D crime that is committed by "intentionally, knowingly or recklessly caus[ing] bodily injury or offensive physical contact to another person." 17-A M.R.S. § 207(1)(A). A law enforcement officer is authorized to arrest without a warrant "[a]ny person who the officer has probable cause to believe has committed or is committing . . . assault, if the officer reasonably believes that the person may cause injury to others unless immediately arrested." *Id.* § 15(1)(A)(5).

The summary judgment record establishes that Defendant Baillargeon observed, or reasonably perceived, Plaintiff laying his hands on the person of a woman in a manner that was offensive to her. Additionally, the undisputed facts establish that Defendant Baillargeon made this observation immediately after being informed by witnesses that they observed a person matching Plaintiff's description "choking" a woman. The witnesses were readily able to identify Plaintiff based on his distinctive shirt color and pointed him out to Baillargeon. On these undisputed facts, which include the officer's own observations, a reasonable officer in Defendant Baillargeon's position could have determined that probable cause existed to arrest Plaintiff. Importantly, even if "alternative inferences could have been derived from the evidence available" to Baillargeon, "the availability of alternative inferences does not prevent a finding of probable cause so long as

the inference upon which the officer relies is reasonable." *Cox v. Hainey*, 391 F.3d 25, 32 (1st Cir. 2004).

Plaintiff insists that an arrest cannot be considered reasonable on these facts because Baillargeon did not interview the alleged victim, and did not have personal knowledge as to the reliability of the two witnesses. He notes that there is a genuine issue of fact as to whether Baillargeon saw Plaintiff shove a different woman to the ground. Plaintiff's arguments are unconvincing. To make a probable cause determination, an officer need not interview all available witnesses. Not infrequently, an officer must make a probable cause determination in the moment without the benefit of interviews of all witnesses and the alleged victim. Here, as part of his investigation of a reported assault by a person of the Plaintiff's description, Baillargeon observed what he reasonably perceived to be an offensive physical touching by Plaintiff. This evidence, even when viewed most favorably to Plaintiff, supports a probable cause finding.

Furthermore, the doctrine of qualified immunity precludes Plaintiff's recovery on a claim for false arrest.[3] While it has long been established that an arrest in the absence of probable cause offends the Fourth Amendment, *Abreu-Guzman v. Ford*, 241 F.3d 69, 73 (1st Cir. 2001) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964), "the doctrine of qualified immunity provides a safe harbor for a wide range of mistaken judgments." *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v.*

---

[3] Qualified immunity applies equally in the context of 5 M.R.S. § 4682 and in the context of 42 U.S.C. § 1983. *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996) (citing *Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994) ("Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA.").

*Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir. 1992)). When it comes to allegations of false arrest, qualified immunity shields an officer from suit "if the presence of probable cause is arguable or subject to legitimate question." *Id.* at 31. When this "added measure of protection against civil liability" is considered in relation to the undisputed facts of this case, *id.*, Defendants are entitled to summary judgment on Count I.

### 2. *Excessive Force (Count II)*

In Count II, Plaintiff alleges that the amount of force used to make his arrest was excessive, in violation of the Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Maine Constitution. Excessive force claims are evaluated under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The state constitutional claim is analyzed according to the same standard. *Richards v. Town of Eliot*, 2001 ME 132, ¶ 31, 780 A.2d 281, 292.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (some internal quotation marks omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Relevant factors for consideration include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* A court's assessment must also account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The test is an objective test:

"whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Defendants argue that the degree of force was reasonable particularly given the location at which the arrest was made. In their view, the tense environment of an after-hours crowd coupled with the report of a choking incident warranted a forceful arrest. They also point to the fact that Plaintiff initially pulled back on his arm when Defendant Baillargeon took hold of him as evidence of Plaintiff's resistance. Finally, they argue that the absence of any significant injury and the fact that they did not kick or punch Plaintiff, reflect that the degree of force was within the bounds of reasonableness.

The perceived criminal offense was a Class D assault. Not insignificantly, there is no evidence that a crime was in progress, or that the safety of any of the individuals in the parking lot was in jeopardy when Baillargeon approached Plaintiff. At the time of the arrest, Plaintiff was moving away from the alleged victim of the assault that Baillargeon believed he perceived. When viewed in the light most favorably to the Plaintiff, the facts do not constitute an exigent situation that required the immediate use of force. Under these circumstances, therefore, one cannot conclude, as a matter of law, that it was reasonably necessary for Defendant Baillargeon to take hold of Plaintiff from behind, thrust him forcefully into a nearby vehicle, take him forcefully to the ground, and place him in a painful hold with his face pressed against the pavement. Additionally, the absence of serious injury is not controlling. "'Serious injury' is not a prerequisite to recovery." *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002) (quoting *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991) (collecting cases)). On this record a genuine issue exists as to whether Defendants subjected Plaintiff to excessive force.[4]

---

[4] Defendant Johnston is implicated in this claim based on his participation while Plaintiff was on the ground.

Defendants alternatively argue that Plaintiff's claim is barred by the doctrine of qualified immunity. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "For example, '[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed.'" *Asociacion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 81 (1st Cir. 2012) (quoting *Saucier*, 533 U.S. at 205). The constitutional prohibition against the use of excessive force has long been clearly established. *See, e.g.*, *Morelli*, 552 F.3d 12, 23-24 (1st Cir. 2009) (describing the law in this area as "crystal clear"). Thus, the question is whether the "use of excessive force constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." *Id.* at 24.

The record generates several factual questions that are material to the issue of qualified immunity. The issues include whether Plaintiff would have presented a danger to a police officer who approached him and used words rather than force; whether Plaintiff actually resisted arrest; whether the officers drove Plaintiff's head into the pavement; and whether the conditions in the parking lot that night were such that any amount of force was necessary. Because these factual issues remain, the Court cannot determine as a matter of law that to arrest Plaintiff, a reasonable officer could have concluded that it was reasonable to employ force and to take Plaintiff to the ground in the manner alleged in this case.

   3.   *Malicious Prosecution (Count III)*

In Count III, Plaintiff alleges malicious prosecution based on an assertion that Defendants "knew or should have known there was no probable cause to support the charges." This claim is advanced under the Fourth Amendment and under Maine common law. Although the facts do not

establish that Plaintiff was held on judicial process pending the criminal trial, Plaintiff's claim is presumably based on a Fourth Amendment seizure resulting from Plaintiff's need to attend criminal proceedings. This Fourth Amendment claim requires Plaintiff to show that Defendants "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (internal quotation marks omitted). For purposes of the common law tort of malicious prosecution, Plaintiff must show "(1) the defendant initiated, procured or continued a criminal action without probable cause; (2) the defendant acted with malice; and (3) the plaintiff received a favorable termination of the proceedings." *Trask v. Devlin*, 2002 ME 10, ¶ 11, 788 A.2d 179, 182.

Defendants assert that summary judgment is warranted based on the existence of probable cause. As for the state law tort claim, Defendants argue that it is within the discretionary function immunity under the Maine Tort Claims Act even if the existence of probable cause is questionable. Plaintiff did not respond in writing to this particular argument.

      *a.*    *The federal claim*

As explained above, a reasonable officer with the same information known to Defendants reasonably could have found probable cause for an arrest. Additionally, Defendants' decision to arrest plainly constitutes conduct within the protection afforded by qualified immunity. That is, on the undisputed facts of the case, probable cause to arrest was at least "arguable." Defendants, therefore, are entitled to summary judgment against the federal constitutional claim in Count III.

      *b.*    *The state tort claim*

The existence of probable cause also supports Defendants' request for summary judgment on the malicious prosecution tort claim in Count III. Moreover, even if the existence of probable

cause was merely "arguable," Defendants are immune under the Maine Tort Claims Act, 14 M.R.S. § 8111(1). Pursuant to that statute:

> 1. Immunity. Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
>
> . . .
>
> C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid;

14 M.R.S. § 8111(1)(C). "By its plain language section 8111(1)(C) confers immunity on the police officers for their decision to prosecute the criminal charges on which the malicious prosecution claims are based." *Dall v. Caron*, 628 A.2d 117, 119 (Me. 1993) (affirming entry of summary judgment on malicious prosecution claim and noting that the immunity granted in section 8111(1)(C) is "absolute"). Plaintiff does not argue otherwise in his Opposition.

## CONCLUSION

Based on the foregoing analysis, the Court grants Defendants' Motion for Summary Judgment on Counts I and III of Plaintiff's Complaint. The Court denies Defendants' Motion for Summary Judgment on Count II of Plaintiff's Complaint.

*So Ordered.*

/s/ John C. Nivison
U.S. Magistrate Judge

February 27, 2014